UNITED STATES DISTRICT COURT
DISTRICT MASSACHUSETTS

_____
                                    )
JOHN R. ROMA,                       )
                                    )
    Plaintiff,                     )
                                    )
    v.                              )    Civil Action No. 1:13-CV-10297-LTS
                                    )
RAITO, INC.,                        )
                                    )
    Defendant.                      )
_____ )


## MEMORANDUM AND ORDER ON RAITO INC.'S MOTION FOR PARTIAL SUMMARY JUDGMENT

March 31, 2015

SOROKIN, J,

I.    INTRODUCTION

This case arises out of an alleged breach of employment agreement, whereby the defendant Raito Inc. ("Raito") employed the plaintiff, John R. Roma ("Roma") in connection with its "deep soil mixing" construction business. Specifically, Roma alleges Raito breached the "Profit Sharing/Bonus Program" provision of the agreement. Raito now moves for Partial Summary Judgment as to Count I (Breach of Contract), Count II (Quantum Meruit), and Count III (Violation of M.G.L.c.149, §§ 148, 150). For the reasons set forth herein, Raito's Motion for Partial Summary Judgment is DENIED, in part, and ALLOWED, in part.

II.     RELEVANT FACTS

Raito is a construction company that specializes in "deep soil mixing." Doc. 42-1 ¶ 1.[1] It is a subsidiary of Raito Kogyo Co., Ltd., a publicly traded engineering and construction company in Japan. Id. ¶ 2. Raito is headquartered in Northern California. Id. ¶ 3.

In November of 2004, Raito hired Roma to establish its New England District Office. Id. ¶ 6. Raito and Roma entered into a letter agreement dated November 18, 2004 ("Letter Agreement"), which set forth the terms of Roma's compensation. Id. ¶¶ 7-9. The Letter Agreement provided, in part, that Roma would receive a starting salary of $120,000 per year, a car allowance, and other benefits. Doc. 1-2. In addition, the Letter Agreement provided:

> You will participate in the following Profit Sharing/Bonus Program. Company profit has to be $600,000.00 at minimum. Last years [sic] lost [sic] (if any), and all taxes due will be deducted from the profit. You will receive 4% of the New England district profit after taxes.

Id.

Shortly after the Letter Agreement was signed in 2004, Roma went to work for Raito and was head of the New England District Office. Doc. 42-1 ¶ 6. He was the only person at Raito with such a profit-sharing provision. Doc. 38 ¶ 14. The "Profit Sharing/Bonus Program" provision forms the crux of Roma's Complaint. Doc. 1. at 3-5. Essentially, Roma claims that Raito failed to include certain amounts collected by Raito for projects Roma worked on, and that in failing to include those amounts, Raito breached the terms of the Letter Agreement. Id. Roma claims he is owed $273,616.00. Id.  Raito counters that it abided by the Letter Agreement in calculating any and all amounts owed to Roma. Doc. 36 at 2-3.[2]  Raito did not create separate

---

[1] Citations are to documents that are part of the docket and viewable via the Court's electronic filing system. Where page numbers are cited, references are to the numbering placed at the top of each page by the electronic filing system.
[2] Raito's motion is styled as one for Partial Summary Judgment because Raito does not seek summary judgment as to certain of Roma's line items which make up part of Count I (Breach of

financial documents or track specifically amounts that may have been owing to Roma under the Letter Agreement until or around March of 2011. Doc. 42-2 ¶ ¶ 26, 50-52.

Part of Roma's duties was to manage a pre-existing project, the Providence River Bridge project known as the "PBS" project. Doc. 42-1 ¶ ¶ 10, 11, 13. The project, as inherited by Roma, had financial problems and substantial cost overruns. Id. ¶ ¶ 12, 13. In or about 2007, Raito filed a lawsuit against two other entities involved with the PBS project. Id. ¶ 15. One of the lawsuits settled in or around March 23, 2012, for $1.5 million and the second lawsuit settled for $2.127 million in or around February of 2013. Doc. 42-1 ¶ ¶ 59, 61. These amounts were not included in Raito's Profit Sharing/Bonus Program calculation. Doc. 37 ¶ 48. Raito never included any profits or losses with respect the PBS project as part of the New England District Office's financial statements as the PBS project was always tracked separately. Id. ¶ ¶ 28, 30, 32. Roma objected to the financial statements, but only insofar they related to issues unrelated to the PBS project. Doc. 42-3 ¶ ¶ 7, 8.

In February of 2011, Raito decided to close the New England District Office. Doc. 42-3 ¶ 28. Once Raito had made its final decision in 2011 to close the New England District Office, Roma and representatives of Raito met in Woburn, Massachusetts, to discuss the amounts that

---

Contract). Specifically Raito does not seek summary judgment on Roma's claim that his profit-sharing was unfairly reduced because Raito interpreted the loss-carry over provision in his letter agreement as requiring losses to be carried forward from year to year until exhausted, rather than for one year only. Doc. 36 at n.2. In addition, Raito does not seek summary judgment as to Roma's claim that the overhead Raito attributed to the New England office was wrong. Id. Finally, another issue raised during the course of the litigation, the so-called "Moses Wheeler Bridge Project," has been agreed upon to the extent that no issue relating to this project is before the Court on Raito's motion. Doc. 42 at 10. Left then, for this Court to consider are Roma's claims related to the Providence River Bridge project, and the "Weeks Marine equipment sale."

Roma contended were owing to him pursuant to the Letter Agreement.[3] Doc. 42-3 ¶ 28. Raito states that Roma asked Raito for "additional" financial incentives for his work on the then, still pending, PBS lawsuits. Doc. 42-1 ¶ 42. Roma denies that he asked for additional incentives, and instead, he states he put forth alternative methods of compensation in an attempt to resolve the differences he had with Raito's upper management with respect to the Profit Sharing/Bonus Program. Id.

In or around November of 2011, Raito sold certain equipment to Weeks Marine ("Weeks"). There is no dispute that the sale of the equipment was, in large part, due to the efforts of Roma. Doc. 42-2 ¶ 36. The equipment was purchased with funds from Raito's headquarters in California. Doc. 36 ¶¶ 11, 12. Raito never included on the financial statements provided to Roma, any capital expenditures or capital gains. Roma, however, argues the capital gains should be attributable to the New England District Office. He relies, in part, on his accounting expert, Justin Amico who opines that under Generally Accepted Accounting Principles ("GAAP") non-operating financial and expenses should be included in the calculation of net profits. Doc. 43 at 86. (filed under seal).[4]

The office officially closed in fall of 2011, Doc. 42-1 ¶¶ 6, 18, 40, 51, and Roma was hired by Weeks. Doc. 42-4 at 29. By agreement between Roma, Raito and Weeks, from October of 2011 and May 15, 2012, Roma worked for both Raito and Weeks and Raito paid his salary. Id.

---

[3] Roma states he brought the subject of the Profit Sharing/Bonus Program to Raito's attention in 2009 or 2010. Doc. 42-2 ¶ 47. There is no evidence in the documents submitted of what he asked for at this time.

[4] Certain documents have been filed under seal pursuant to the Confidentiality Stipulation and Protective Order dated September 6, 2013, which is intended to prevent the disclosure of a "legitimate financial or privacy interest." Doc. 24 ¶ 1. This Court has determined that any disclosure herein of any document, or part of any document, filed under seal does not fall within the parameters of the Confidentiality Stipulation and Protective Order.

After May 15, 2012, Roma continued to do some work for Raito in order to finalize the PBS settlement at which time Marine Weeks paid Roma his salary. Doc. 42-3 ¶ 26.

III. LEGAL STANDARD

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Once a party has properly supported its motion for summary judgment, the burden shifts to the nonmoving party, who "may not rest on mere allegations or denials of his pleading, but must set forth specific facts showing there is a genuine issue for trial." Barbour v. Dynamics Research Corp., 63 F.3d 32, 37 (1st Cir. 1995) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986)). Further, a court may enter summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrell, 477 U.S. 317, 322 (1986). The Court is "obliged to view the record in the light most favorable to the nonmoving party, and to draw all reasonable inferences in the nonmoving party's favor." LeBlanc v. Great Am. Ins. Co., 6 F.3d 836, 841 (1st Cir. 1993). Even so, the Court is to ignore "conclusory allegations, improbable inferences, and unsupported speculation." Prescott v. Higgins, 538 F.3d 32, 39 (1st Cir. 2008) (quoting Medina-Munoz v. R.I. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990)).

"There must be sufficient evidence favoring the nonmoving party for a [factfinder] to return a verdict for that party. If the evidence is merely colorable or is not significantly probative, summary judgment may be granted." Anderson, 477 U.S. at 249-50. "Trialworthiness requires not only a 'genuine' issue but also an issue that involves a 'material' fact." Nat'l Amusements, Inc. v. Town of Dedham, 43 F.3d 731, 735 (1st Cir. 1995). A material fact is one which has the

"potential to affect the outcome of the suit under applicable law." Nereida-Gonzalez v. Tirado-Delgado, 990 F.2d 701, 703 (1st Cir. 1993). For a factual dispute to be "genuine," the "evidence relevant to the issue, viewed in the light most flattering to the party opposing the motion, must be sufficiently open-ended to permit a rational fact finder to resolve the issue in favor of either side." Nat'l Amusements, Inc., 43 F.3d at 735 (internal citation omitted).

IV. DISCUSSION

A. Breach of Contract (Count I)

Raito moves for summary judgment on Roma's theories that Raito breached the profit sharing provision of the letter agreement by: (1) failing to provide Roma his share of the settlement proceeds from the PBS project as profit of the New England Office; and (2) by failing to provide Roma his share of the gains made by the sale of equipment as profit of the New England Office. To prevail on a breach of contract claim under Massachusetts law, Plaintiffs must establish: (1) a binding contract; (2) breach of a specific provision of the contract; and (3) damages flowing therefrom. Michelson v. Digital Fin. Servs., 167 F.3d 715, 720 (1st Cir. 1999).

There is no dispute that the Letter Agreement dated November 18, 2004, is a binding contract between the parties. The parties dispute, however, whether Raito correctly applied and calculated Roma's bonus as it relates to the PBS project and the Weeks equipment sale.

1. The PBS Project

Under Massachusetts law, courts are required to interpret a contract "according to its plain meaning." S. Union Co. v. Dep't of Pub. Utils., 941 N.E. 633, 640 (Mass. 2011). The ordinary meaning of the term the "New England district profit" is the profit generated from the projects managed by Roma, and those employees of the New England District Office whom he supervised. For purposes of contract interpretation, plainly these projects included the PBS project

because there is no dispute that Roma and those he supervised, worked on this project. Nonetheless, several additional facts relating to the parties' conduct and course of dealing bear on whether the PBS project qualifies under the Letter Agreement as a project of the New England District Office for purposes of calculating Plaintiff's profit sharing bonus. <u>Keating v. Stadium Mgmt. Corp</u>., 508 N.E. 2d 121, 124 (Mass. App. Ct. 1987) ("To enable us to understand the subject matter of the agreement, to the extent it is doubtful or ambiguous, we resort to the conduct of the parties to determine the meaning that they themselves put upon any doubtful or ambiguous terms.")(internal citations and quotation marks omitted); <u>NSTAR Elec. Co. v. Dep't of Pub. Utils</u>., 968 N.E. 2d 895, n.11 (Mass. 2012) (recognizing that under Massachusetts law parties may memorialize their bargain in imprecise terms and that the meaning of terms may be viewed in light of parties' course of dealing); <u>Restatement (Second) of Contracts</u> §223 and comment b (1981) (course of dealing between the parties gives meaning to or supplements their agreement and there is no requirement that agreement be ambiguous before the court can be guided thereby).

First, each year for seven years, Raito provided Roma financial statements for the New England District Office. Doc. 42-3 ¶ 6. These statements tallied operational revenues arising from New England District Office projects, as well as expenses arising from these same projects and a share of corporate overhead resulting in a profit or loss. Doc. 36 at 5-6. The PBS project, already a problem when Roma began working for Raito, Doc. 42-1 ¶¶ 10, 11, 13, was listed on these statements <u>separately</u> from all the other offices**.** Doc. 37 ¶¶ 28, 30, 32. Roma never objected to the failure to include the PBS project within the calculation for the New England District Office. To

the contrary, Roma identifies various objections he made to the financial statements, Doc. 42-3 ¶ 2, but Roma omits mention of any objection on this point.[5]

Second, Roma did not include the PBS project on a list of New England District Office projects he sent to E.E.Cruz, a company that was considering purchasing Raito's local operations and equipment. Doc. 39-1 at 155. Roma, however, after Raito announced in 2011 that it intended to close the New England District Office, met with Raito officials in Woburn. Doc. 42-3 ¶ 28. During this meeting, Roma asserted that "any gain on the Providence Bridge claim" should be included in his profit sharing. Doc. 42-4 at 29. The parties also discussed a variety of different methods to satisfy Roma's assertion he should be compensated for his work on the Providence Bridge claim. Id.

Third, Roma supports his opposition with an accounting expert. Doc. 43 Ex. G. The expert's opinion regarding the application of GAAP principles has no bearing on the interpretation of the contract. The New England District Office was not an entity. Nothing in either the text of the contract or in the parties' courses of dealing even suggests that the parties intended their agreement to incorporate accounting principles to determine the scope of projects falling within the rubric of the New England District Office.

The foregoing creates a genuine issue of material fact regarding the parties' course of dealing with respect to whether the PBS project qualifies under the Letter Agreement as part of the New England District Office. While the yearly accounting statements are certainly good evidence in support of the Raito's motion, and augmented by Roma's email to E.E. Cruz, Raito does not contend that the financial statements were prepared, or created for purposes of determining

---

[5] Roma does note in his affidavit that Raito never allocated a portion of Roma's time or New England District Office overhead to the PBS project. Doc. 42-3 at ¶ 37. Apparently, Roma never objected.

Roma's bonus calculation. And, only Roma had a bonus plan tied to profits. Doc. 38 ¶ 14. Thus, neither the parties' conduct, nor their course of dealing resolves, on a motion for summary judgment, whether the work Roma did on the PBS project falls within the terms of the Letter Agreement. A reasonable jury, relying on the ordinary meaning of the Letter Agreement, as well as the work Roma indisputably performed, could conclude that the PBS project, for purposes of calculating Roma's bonus, should have been included given that the financial statements created by Raito were not created for the purpose of calculating Roma's bonus. Accordingly, the Motion for Summary Judgment is DENIED as to the PBS project.

    2. The Sale of Equipment to Weeks Marine

As to the sale of equipment to Weeks Marine, Roma likewise argues that the capital gain from the sale should be included in the New England District Office. Doc. 42 at 11. However, the ordinary meaning of the profit sharing bonus provision in the Letter Agreement, gave Roma 4%, net of taxes, of each year's operating profit generated by the New England District Office. Here, the annual financial statements provide sufficient evidence establishing that Raito consistently included, for the New England District Office, only the operating expenses of the New England office, and revenue generated by contracts obtained by the New England District Office. Doc. 43 at 39-71. Of course, in light of Raito's business – obtaining contracts to provide construction services – this system of accounting made sense for the twin purposes of the financial statements: (1) measuring the general profitability of the New England Office; and (2) providing a basis to calculate Roma's bonus. At no time in the course of the years Roma worked at Raito did the financial statements ever include the cost of capital purchases or revenue generated from the sale of such assets.

Moreover, the New England District Office used the equipment which was eventually sold to Weeks. The cost of purchasing this equipment was never included in the financial statements and Roma does not propose a deduction for it. Roma's theory would necessarily produce a windfall profit for him. The financial statements did include a depreciation charge for equipment, but that is akin to a rental charge reflecting some measure of the value of the asset consumed by the use and aging that occurred over the year. In short, this undisputed course of dealing establishes that the parties did not intend, and did not include, within the profit calculation of the New England District Office the purchase or sale of capital assets. See e.g. Restatement (Second) Contracts §223 (1981), illus.1. ("A, a sugar company, enters into a written agreement with B, a grower of sugar beets, by which B agrees to raise and deliver and A to purchase specified quantities of beets during the coming season. No price is fixed. The agreement is on a standard form used for B and many other growers in prior years. A's practice is to pay all growers uniformly on a formula based on A's "net return" according to A's established accounting system. Unless otherwise agreed, the established pattern of pricing is part of the agreement."). [6]

Accordingly, the Motion for Summary Judgment is ALLOWED regarding Roma's claim Raito's failure to include the revenue generated by the sale of equipment to Weeks breached the Letter Agreement.

---

[6] Moreover, Roma seeks to rely on an excerpt from his expert for the proposition that he Letter Agreement encompassed non-operating income and expenses which under GAAP, includes gain on sale of disposition of assets. Doc. No. 43 at 86 (filed under seal). While the parties certainly could have structured a profit sharing agreement based upon GAAP, the text of the Letter Agreement as informed by the nature of Raito's business (selling construction services), and the parties' undisputed course of conduct, establishes that they did not.

B. Quantum Meruit (Count II)

In Massachusetts, the elements of a quantum meruit recovery are: (1) the plaintiff conferred a reasonable benefit upon the defendants; (2) defendants accepted the services with the reasonable expectation of compensating the plaintiff; and (3) the plaintiff provided the services with the reasonable expectation of receiving compensation. Backman v. Smirnov, 751 F. Supp. 2d 304, 314 (D. Mass. 2010) (citing Bolen v. Paragon Plastics, Inc., 747 F. Supp. 103, 106-07 (D. Mass. 1990)); Smilow v. Sw. Bell Mobile Systems, Inc., 323 F.3d 32, 38-39 (1st Cir. 2003).

Raito argues that Roma is not entitled to recover under a theory of quantum meruit because there had been a written contract between Roma and Raito. Doc. 36 at 12. Generally, "[r]ecovery in quantum meruit presupposes that no valid contract covers the subject matter of a dispute. Where such a contract exists, the law need not create a quantum meruit right to receive compensation for services rendered." Boswell v. Zephyr Lines, Inc., 606 N.E.2d 1336, 1342 (Mass. 1993). Here, there is no dispute that the parties had a valid contract which remained in force up until the fall of 2011. Then, after the New England district office "officially closed" in the fall of 2011, Roma continued to work for Raito and specifically on the PBS settlement, which proceeds were received after Roma stopped working for Raito. Roma also began to do work for Marine Weeks. As Roma put it, he "was working for two masters." Doc. 42-4 at 29. As he explained in his deposition, a deal was struck, whereby Roma would continue to get paid by Raito up until May 15, 2012 and thereafter he would get paid by Marine Weeks for work that was mixed between the two companies. Id. Roma acknowledged "that was all part of the deal." Id. This leaves unanswered, however, whether the work done by Roma after the New England District Office was closed, was done pursuant to the terms of the Letter Agreement. This material issue of fact has not been answered by the documents or briefs submitted by the parties.

Accordingly, Raito's Motion for Summary Judgment on Roma's quantum meruit claim is DENIED as to the PBS project. The motion is ALLOWED in all other respects.[7]

    C. Violation of M.G.L. c. 149, §§ 148, 150 (Count III)

The "Massachusetts Wage Act," G.L. c. 149, § 148 provides in relevant part that:

> [Employers] shall pay weekly or bi-weekly each such employee the wages earned by him . . . [and] any employee leaving his employment shall be paid in full on the following regular pay day, and, in the absence of a regular pay day, on the following Saturday . . . . No person shall by a special contract with an employee or by any other means exempt himself from this section . . . . An employer who violates the act is subject to possible civil and criminal penalties, injunctive relief, treble damages, and attorney's fees and costs.

Id. at §§ 27C, 148, 150.

To state a claim under the Act, a plaintiff "must prove (1) he was an employee under the statute; (2) his deferred compensation constitutes a 'wage' under the statute; [and] (3) the defendants violated the Act by not paying him his wages in a timely manner." Doucot v. IDS Scheer, Inc., 734 F. Supp. 2d 172, 192 (D. Mass. 2010) (citing Stanton v. Lighthouse Financial Services, Inc., 621 F. Supp. 2d 5, 10 (D. Mass 2009)). The issue before the Court is whether the monies Roma alleges are due under the Letter Agreement constitute "wages" for purposes of the Wage Act. For the reasons set forth, any amounts owed under the Profit Sharing/Bonus Program do not, as a matter of law, constitute wages for purposes of the Act.

"The Wage Act requires prompt payment of 'wages earned' on pain of civil and criminal penalties, treble damages, and attorney's fees." Weiss v. DHL Express, Inc. 718 F.3d 39, 47 (1st Cir. 2013). The "the intent of the Wage Act is to protect laborers and casual wage earners who

---

[7] The evidence is undisputed that the work Roma did in connection with the sale of equipment to Weeks, was done while Roma was still employed by Raito and while the Letter Agreement was still in force. Accordingly, as to the equipment sale, Roma's quantum meruit claim fails as a matter of law.

might otherwise be vulnerable to employer intimidation." Baptista v. Abbey Healthcare Group, Inc., No. 95-10125, 1996 U.S. Dist. LEXIS 22797, at * 12 (D. Mass. Apr. 10, 1996). Wages include holiday pay, vacation pay, and definitely determined commissions, but the term "wages" is not otherwise defined. Mass. Gen. L. ch. 149, § 148. And, because the Wage Act carries criminal penalties, see § 27C, courts have been reluctant to extend its reach beyond the wages, salary, holiday pay, vacation pay, and definitely determined commissions which the statute expressly mentions. Weiss, 718 F. 3d at 47. The term "wages" has been interpreted to mean those wages which have been "earned," and not monies which are "discretionary" or "contingent." See Weems v. Citigroup, 900 N.E.2d 89, 94 (Mass. 2009) (employee bonuses which were "discretionary" were not wages under the Wage Act); Weiss, 718 F. 3d at 47 (bonus contingent on continued employment not wages); Sterling Research, Inc. v. Pietrobono, No. 02-40150-FDS, 2005 U.S. Dist. LEXIS 31267, at * 42 (D. Mass. Nov. 21, 2005) ("generally bonuses are not 'wages earned' within the meaning" of the Wage Act); Dennis v. Jager, Smith & Stetler, P.C., No. 9849740, 2000 Mass. Super. LEXIS 114, at * 3 (Mass. Super. Ct. Apr. 10, 2000) (court noted distinction between "wages," which include assured compensation from compensation 'triggered by contingencies' and thus outside the scope of the Wage Act").

  Roma argues that because the amounts owing were not discretionary but were, instead, mandatory and arithmetically calculable, the Wage Act should apply. Roma confuses the case law surrounding arithmetically calculable "commissions" as distinguished from "bonuses." In this regard, Suominen v. Goodman Indus. Equities Mgmt. Group, LLC, 941 N.E.2d 694 (Mass. App. Ct. 2010) is particularly instructive. In Suominen, the plaintiff was involved in a real estate development and was promised, in addition to his base salary, an interest in the "promote," which is a type of profit real estate developers sometimes receive. Id. at 697. The plaintiff was

fired, and he was not paid any amounts related to the promote. The plaintiff argued that his share of the promote was a commission covered by the Wage Act, and therefore, all he needed to show was that the commission was "due and payable" and "arithmetically determinable." Id. at 705. The court held the promote was not a commission because a commission is generally understood to include "compensation owed to those in the business of selling goods, services, or real estate, set typically as a percentage of the sales price," id., and in this case, the promote was "a share of the overall profits generated by the development efforts." Id. Likewise here, the Letter Agreement expressly called for a share of the profits—not a percentage of a sales price from the sale of goods, services or real estate. Moreover, Roma's bonus also depended on Raito achieving a certain level of profitability. Therefore, the amounts Roma seeks are not commissions and are not wages for purposes of the Wage Act.

Roma seeks to rely Feygina v. Hallmark Health Sys., 2013 Mass. Super. LEXIS 72 (Mass. Super. Jul. 12, 2013). In Feygina, a physician's contract included a provision for a base salary and incentive pay which was tied to the amount of revenue she generated for the medical practice. Id. at * 4. The court held the incentive pay fell within the Wage Act because it was a commission. Id. at * 15. In so holding, the court distinguished the physician's arrangement from the "profit sharing" arrangement in Suominen:

> Unlike the compensation plan at issue in Suominen v. Goodman Industrial Equities Mgmt. Group, LLC, 78 Mass.App. Ct. 723, 737-38, 941 N.E.2d 694, rev. denied, 459 Mass. 1109, 944 N.E.2d 1045 (2011), the parties' employment agreement did not give Feygina any entitlement to any share of HHMA's profits. Instead, HHMA agreed to pay Feygina incentive compensation that was pegged to the amount of revenue that Feygina's own practice generated each year. Where an employee is promised both a base salary and additional payments based "on the amount of revenue [s]he generated" for her employer, those additional payments are "commissions" subject to the Wage Act.

Id. at * 14.

It is undisputed that Roma's Letter Agreement called for a percentage of profits from the New England District Office (if Raito's profits exceeded $600,000), not incentive pay based upon revenues generated which might qualify as commissions under the Wage Act. Accordingly, his claim for violation of the Wage Act fails as a matter of law. Raito's Motion for Summary Judgment as to Count III (Violation of M.G.L. c. 149, §§ 148, 150) is ALLOWED.

## CONCLUSION

Raito Inc.'s Motion for Partial Summary Judgment as to Count I (Breach of Contract) is DENIED with respect to the "PBS claim," and ALLOWED with respect to the "Weeks equipment sale" claim, DENIED as to Count II (Quantum Meruit) with respect to the "PBS claim," and ALLOWED with respect to the "Weeks equipment sale claim," and ALLOWED with respect to Count III (Violation of M.G.L.c.149, §§ 148, 150).

SO ORDERED.

/s/ Leo T. Sorokin
Leo T. Sorokin
United States District Judge